GALVESTON LINEHANDLERS, INC. and Gulf Coast Linehandlers, Inc.

v.

INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, Local Number # 20 et al.

No. CIV. A. G–01–015.

United States District Court, S.D. Texas, Galveston Division.

May 15, 2001.

Christopher B Ramey, Kilburn Jones et al, Houston, TX, for Galveston Linehandlers, Inc., Gulf Coast Linehandlers, Inc., plaintiffs.

James R. Watson, Jr., ILA, S. Atlantic & Gulf Coast District, Andrew J. Mytelka, Greer Herz & Adams, Galveston, TX, for International Longshoremen's Association, Local Number # 20, Michael D. Moore, Adolph D. Suderman, III, defendants.

### ORDER GRANTING PLAINTIFFS' MOTION TO REMAND

KENT, District Judge.

Plaintiffs brought suit in state court against Defendants alleging various state law causes of action. Defendants removed the case, arguing that Plaintiffs' claims are completely preempted by federal law. Now before the Court is Plaintiffs' Motion to Remand. For the reasons stated below, Plaintiffs' Motion is **GRANTED**. In doing so, the Court notes that the facts of this case are so unique that it is not only a case of first impression, it is likely a case of *last* impression.

### I. BACKGROUND

Plaintiffs Gulf Coast Linehandlers, Inc. ("Gulf Coast") and Galveston Linehandlers, Inc. ("Galveston Linehandlers") are corporations which provide mooring services for vessels in the Port of Galveston. Defendant International Longshoremen's Association, Local Number # 20 ("Local # 20") is a labor union which provided labor to Gulf Coast. Defendants Michael D. Moore ("Moore") and Adolph D. Suderman III ("Suderman") are individuals who allegedly created a rival mooring services company, Suderman Stevedores, with the help of Local # 20 officials. If Plaintiffs' allegations are believed, the Court is presented with the following factual scenario. In August of 1997, Gulf Coast entered into

a written agreement with Local # 20 to utilize Local # 20 labor for the mooring of vessels. In November of 1998, this agreement was terminated through a no fault provision, but Gulf Coast continued to utilize Local # 20 labor. Almost two years later, in September of 2000, a conflict ensued between Gulf Coast and Local # 20 regarding the use by Gulf Coast of labor provided by International Longshoreman's Association 1504. Local # 20 officials allegedly began interfering in some unspecified way with parties with whom Gulf Coast had contracts. In October of 2000, Gulf Coast and Local # 20 held negotiations in which Local # 20 officials allegedly promised to stop this interference and to present Gulf Coast's proposed labor agreement to Local # 20 membership for their approval at their next meeting on November 1, 2000. Based on these promises, Gulf Coast continued to use Local # 20 labor. Gulf Coast complains that: 1) their proposal was never presented to Local # 20 membership; 2) Local # 20 officials began a conspiracy to interfere with Gulf Coast's existing contracts; and 3) Local # 20 officials conspired with Defendants Moore and Suderman to create their own mooring service to steal Gulf Coast's business. Gulf Coast claims that as a result, K–Line America ("K–Line") cancelled its contracts with Gulf Coast in favor of Suderman Stevedores, resulting in a loss of revenue for Gulf Coast of approximately $10,000 annually. Gulf Coast brings claims against Defendants for: 1) economic duress and coercion; 2) tortious interference with contract and with business opportunities; 3) fraud, fraudulent inducement, and conspiracy to commit fraud; 4) negligent misrepresentation and gross negligence; and 5) promissory and equitable estoppel.

Galveston Linehandlers, the other Plaintiff in the case, also claims to have lost business contracts as a result of Defendants' alleged machinations. Plaintiffs' Complaint, however, fails to reveal what relationship, if any, Galveston Linehandlers had with Local # 20. It simply states that unlike Gulf Coast, Galveston Linehandlers did not rely on any representations made by Local # 20, but had it been aware of the covert activities, it would have taken "defensive measures" to protect its existing contracts. Galveston Linehandlers allegedly lost its contracts with Carnival Cruise Line and Solar Yang–Ming Line to Suderman Stevedores, resulting in a loss of revenue of approximately $57,000 annually. Thus, Galveston Linehandlers brings claims for: 1) economic duress and coercion; 2) tortious interference with contract and with business opportunities; 3) fraud, fraudulent inducement, and conspiracy to commit fraud; and 4) gross negligence.

Although Plaintiffs' Complaint alleges only state law causes of action, Defendants removed the case claiming that Plaintiffs' claims are preempted by the National Labor Relations Act, 29 U.S.C. § 151 et seq. ("NLRA" or "Act"), thus giving rise to jurisdiction under 28 U.S.C. § 1331.

## II. ANALYSIS

A defendant may remove a state court action to federal court only if the action could have been originally filed in federal court. 28 U.S.C. § 1441(a); *Caterpillar v. Williams,* 482 U.S. 386, 391–92, 107 S.Ct. 2425, 2429, 96 L.Ed.2d 318 (1987); *Wallace v. Ryan–Walsh Stevedoring Co.,* 708 F.Supp. 144, 150 (E.D.Tex. 1989). Where, like this case, there is no diversity jurisdiction, a federal question must exist for removal to be proper. *Caterpillar,* 482 U .S. at 392, 107 S.Ct. at 2429; *Rheams v. Bankston, Wright & Greenhill,* 756 F.Supp. 1004, 1008 (W.D.Tex.1991). Whether a federal question exists depends upon the well-pleaded complaint rule, which provides that the

plaintiff's complaint governs the jurisdictional determination. *Caterpillar*, 482 U.S. at 392, 107 S.Ct. at 2429; *Cedillo v. Valcar Enter.*, 773 F.Supp. 932, 934 (N.D.Tex.1991). If the complaint, on its face, contains no issue of federal law, then there is no federal question jurisdiction. *Franchise Tax Board v. Construction Laborers Vacation Trust*, 463 U.S. 1, 10, 103 S.Ct. 2841, 2846, 77 L.Ed.2d 420 (1983); *Rheams*, 756 F.Supp. at 1008. The fact that a federal defense may be raised to the plaintiff's action will not create federal question jurisdiction. *Franchise Tax Board*, 463 U.S. at 12, 103 S.Ct. at 2847; *Powers v. South Cent. United Food & Commercial Workers Unions*, 719 F.2d 760, 764 (5th Cir.1983). If there is neither diversity jurisdiction nor a federal question, the court must remand the suit to the state court whence it originated.

An important corollary to the well-pleaded complaint rule is the artful pleading doctrine. *See* 14A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3722 (1998). Although a plaintiff is the master of his complaint and may choose to assert only state law claims, a court will occasionally seek to determine whether the real nature of an action is federal, regardless of the plaintiff's characterization. For instance, under the complete preemption doctrine, federal law can so thoroughly preempt a field of state law that the plaintiff's complaint must be characterized as stating a federal cause of action, even if the complaint, on its face, contains only state law causes of action. *See, e.g., Caterpillar*, 482 U.S. at 393, 107 S.Ct. at 2430; *Metropolitan Life Insurance Co. v. Taylor*, 481 U.S. 58, 64, 107 S.Ct. 1542, 1547, 95 L.Ed.2d 55 (1987); *Franchise Tax Board*, 463 U.S. at 23–24, 103 S.Ct. at 2854; *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 675, 94 S.Ct. 772, 781, 39 L.Ed.2d 73 (1974). "In these situations the federal removal court will look beyond the letter of the complaint to the substance of the claim in order to assert jurisdiction." Wright et al., *supra*, § 3722. For complete preemption to adhere, the federal law must so completely preempt the field that any suit that sounds in that area necessarily is a federal action. *Wallace*, 708 F.Supp. at 151. This doctrine was first formulated by the Supreme Court in *Avco Corp. v. Aero Lodge No. 735*, 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968). In *Avco*, the defendant, a labor union, removed to federal court a suit in which an employer sought an injunction against a labor strike, arguing that the strike violated a collective bargaining agreement between the employer and the union. The Supreme Court upheld the union's removal despite the fact that the employer's suit contained no federal question on its face. The Court concluded that Section 301 of the Labor Management Relations Act so thoroughly preempts state law as to force the Court to recharacterize the employee's complaint as arising under that section of the act. *Id.* at 561, 88 S.Ct. at 1237.

The NLRA preempts some but not all state law claims related to labor-management. The Supreme Court has articulated various doctrines for determining when state regulation is preempted by the NLRA. Under the primary doctrine, the Court asks whether the conduct a state seeks to make a basis of liability is actually or arguably protected or prohibited by the NLRA. *Local 926, Int'l, Union of Operating Eng'rs, AFL–CIO v. Jones*, 460 U.S. 669, 676, 103 S.Ct. 1453, 1458–59, 75 L.Ed.2d 368 (1983); *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 245, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959). If so, otherwise applicable state law is preempted. When, however, the conduct at issue is only a peripheral concern of the Act or touches on interests so deeply rooted in local feeling and responsibility that, in the absence of compelling

Congressional direction, it could not be inferred that Congress intended to deprive the states of the power to act, the Court will refuse to invalidate state regulation or sanction of the conduct. *Local 926*, 460 U.S. at 676, 103 S.Ct. at 1458–59; *Garmon*, 359 U.S. at 243–44, 79 S.Ct. at 778–79.[1]

### A. *Gulf Coast Linehandlers*

Applying the preemption principles to Gulf Coast's claims, the Court first asks whether the conduct made the basis of liability in this case is actually or arguably protected or prohibited by the NLRA. Gulf Coast claims basically that Local # 20 made misrepresentations during the collective bargaining negotiations and interfered with Gulf Coast's contractual relations with a third party.

■ The Court first considers Local # 20's alleged conduct during the collective bargaining negotiations. The NLRA makes it an unfair labor practice for a labor organization to refuse to bargain collectively with an employer whose employees it represents. 29 U.S.C. § 158(b)(3). The obligation to bargain collectively includes a duty to "confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder." 29 U.S.C. § 158(d). Thus, Gulf Coast's alleged conduct appears to fall squarely within the letter of the Act. To negotiate a collective bargaining agreement without having any intention of entering into the agreement is arguably the height of bad faith. Thus, the Court concludes that the conduct alleged is actually or arguably prohibited by the Act.

Determining that the conduct involved is actually or arguably prohibited or protected by the NLRA is, however, only the first step in the preemption analysis. The Court must next consider whether such can be considered a peripheral concern of the Act or so deeply rooted in local feeling and responsibility that federal preemption would be inappropriate. The Court concludes that the conduct alleged is sufficiently dissimilar from most labor disputes as to qualify as a peripheral concern of the Act, even if technically covered by its language. The mill run of bad faith cases under the NLRA involve the use of alleged bad faith tactics occurring during bona fide negotiations.[2] Here, by contrast, the alle-

---

**1.** The second preemption doctrine holds that the NLRA preempts "state law and state causes of action relating to conduct that is neither protected or prohibited, where it is determined that Congress intended the conduct to be unregulated and left to the free play of economic forces." *Local 926*, 460 U.S. at 676 n. 8, 103 S.Ct. at 1459; *Machinists v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132, 140, 96 S.Ct. 2548, 2553, 49 L.Ed.2d 396 (1976); *Teamsters Local 20 v. Morton*, 377 U.S. 252, 260, 84 S.Ct. 1253, 1258, 12 L.Ed.2d 280 (1964). Cases applying this doctrine often involve the use of "economic weapons" by labor as a means of putting pressure on management in the collective bargaining process. When such activity is neither protected nor prohibited by federal law, Courts have nevertheless held that subjecting the conduct to state regulation would frustrate the congressional intention to leave these self-help measures unregulated. *See e.g. Machinists*, 427 U.S. at 154–55, 96 S.Ct. at 2560 (preempting state claims based on a union's partial strike in which its members refused to work overtime)

**2.** *See, e.g., N.L.R.B. v. Katz*, 369 U.S. 736, 743–44, 82 S.Ct. 1107, 1111–1112, 8 L.Ed.2d 230 (1962)(holding that an employer fails to bargain in good faith if it unilaterally changes a term or condition of employment without having reached an impasse in bargaining); *Calex Corp. v. N.L.R.B.*, 144 F.3d 904, 909 (6th Cir.1998)(noting that dilatory and delaying tactics are indicative of bad faith); *N.L.R.B. v. Pennsylvania Tel. Guild*, 799 F.2d 84, 87 (3rd Cir.1986) (holding that a union violates the NLRA by insisting on nonmandatory subjects as a precondition to bargaining); *Mead Corp. v. N.L.R.B.*, 697 F.2d 1013, 1022 (11th Cir.1983)(holding that withdrawal with-

gation is that the entire negotiation was a sham on the part of Local # 20. Defendants have not brought to the Court's attention any case under the NLRA even remotely similar to this one, nor has the Court, using genuine diligence, located such a case. The use of sham collective bargaining negotiations as a cover for independent business competition, the Court must conclude, was likely not foremost in the mind of Congress when it enacted its comprehensive scheme of labor-management relations in the NLRA. Instead, this type of behavior falls within the realm of ordinary business disputes of the type traditionally regulated by state law. A state's interest in regulating potential business torts should not be negated simply because one of the participants in the alleged conduct happens to be a labor union and collective bargaining negotiations are incidentally involved. Moreover, even in the context of traditional labor disputes, Courts have refused to preempt state law causes of action when the interest and issues involved would be different from those that would arise before the National Labor Relations Board. *Sheet Metal Workers Local Union No. 54, AFL–CIO v. E.F. Etie Sheet Metal Co.*, 1 F.3d 1464, 1469–70 (5th Cir.1993)(citing *Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters*, 436 U.S. 180, 197–98, 98 S.Ct. 1745, 1757–58, 56 L.Ed.2d 209 (1978)) ("The critical inquiry . . . is whether the controversy presented under state law to the courts is identical to or different from that which could have been, but was not, presented to the National Labor Relations Board.").

■ Similarly, Gulf Coast's tortious interference claim is not preempted. Defendants' Motion suggests, though does not directly state, that the conduct forming the basis of the claim could be considered a secondary boycott. The NLRA prohibits secondary boycotts in certain instances. Specifically, it makes it an unfair labor practice for a union or its agent to "threaten, coerce, or restrain" any person engaged in commerce or in an industry affecting commerce where the purpose is "forcing or requiring any person to," among other things "cease doing business with any other person." 28 U.S.C. § 158(b)(4)(ii)(B); *George v. National Ass'n of Letter Carriers*, 185 F.3d 380, 383 (5th Cir.1999). There is no assertion that Defendants engaged in such conduct. Nor could the alleged interference be characterized as a secondary boycott of the type arguably protected by the Act. A secondary boycott generally involves "a labor union's exertion of pressure on a neutral employer with whom the union has no dispute, in order to force that neutral employer to stop dealing with the primary employer with whom the union does have a dispute." *George*, 185 F.3d at 383. Here, the allegation is that Local # 20 convinced K–Line to cease doing business with Gulf Coast, not to gain leverage in a dispute with Gulf Coast, but to benefit the newly formed Suderman Stevedores with which it was allied. This type of behavior, if it is a concern of the Act at all, would be "peripheral" at best. Thus, state law causes of action based on this conduct should not be displaced.

For the above stated reasons, the Court concludes that Plaintiff has not artfully

out good cause of a tentatively agreed upon proposal was evidence of bad faith); *Associated Gen. Contractors of America, Evansville Chapter, Inc. v. N.L.R.B.*, 465 F.2d 327, 334–35 (7th Cir.1972)(holding that a union failed to bargain collectively by taking an inflexible position); *Brennan v. Emerald Renovators, Inc.*, 410 F.Supp. 1057, 1061 (S.D.N.Y.1975)(holding that insistance on the inclusion of illegal contract provisions constitutes refusal to bargain in good faith).

pleaded federal causes of action as state law claims, but that Defendant has attempted to artfully replead Plaintiff's state law claims into federal causes of action.

### B. *Galveston Linehandlers*

█ It is unclear from Plaintiffs' Complaint what relationship Galveston Linehandlers had with Local # 20. There is no allegation that Galveston Linehandlers had or was negotiating any collective bargaining agreement with Local # 20. Indeed, Plaintiffs' Complaint notes that Galveston Linehandlers did not rely on any representation on the part of Local # 20. Nor is there any indication if Galveston Linehandlers even utilized Local # 20 labor. Thus, there is no basis for federal preemption of the state law claims brought by Galveston Linehandlers, if for no other reason than that they do not involve collective bargaining or a labor-management dispute whatsoever. Moreover, even if Galveston Linehandlers did have a labor-management relationship with Local # 20, the claims it brings would not be preempted, for the same reasons that Gulf Coast's claims are not preempted.

### III. *CONCLUSION*

For the reasons stated above, Plaintiffs' Motion to Remand is **GRANTED**. The entire case is **REMANDED** to the 212th Judicial District Court of Galveston County from which it was removed. Each party is to bear its own costs in the matter incurred herein to date.

Furthermore, pursuant to the clear language of 28 U.S.C. § 1447(d), this Order of Remand is unreviewable, by appeal or otherwise. *See also Things Remembered, Inc. v. Petrarca,* 516 U.S. 124, 127, 116 S.Ct. 494, 496, 133 L.Ed.2d 461 (1995); *Angelides v. Baylor College of Med.,* 117 F.3d 833, 835 (5th Cir.1997); *Linton v. Airbus Industrie,* 30 F.3d 592, 600 (5th Cir.1994); *Tillman v. CSX Transp., Inc.,* 929 F.2d 1023, 1024, 1027 (5th Cir.1991).

**IT IS SO ORDERED.**